MARY CARRIGAN, Administratrix, Appellee, v. MINNEAPOLIS &
ST. LOUIS RAILROAD COMPANY, Appellant.

RAILROADS: Personal Injury—Negligence—Belated Train. No
1 presumption of negligence arises from the naked fact that a
train was behind its scheduled time.

RAILROADS: Personal Injury—Negligence—Lookout—Rule of
2 Duty. It is pure speculation to charge the jury that a carrier,
in approaching a crossing, must keep a lookout for horses which
"*might* take fright."

RAILROADS: Personal Injury—Negligence—Dragnet Instruction.
3 The door of pure speculation is opened to a jury by an instruc-
tion which permits the jury to predicate negligence on the
failure to perform "acts or things" (a) not complained of in the
pleadings, (b) not shown in the evidence, and (c) not specified
in the instruction.

NEGLIGENCE: "Last Clear Chance"—Evidence Reviewed. Evi-
4 dence reviewed and held to show no negligence rendering de-
fendant liable under the doctrine of the "last clear chance."

NEGLIGENCE: Statutory Duty—Violation—Proximate Cause.
5 The violation of a statutory duty does not necessarily fix re-
sponsibility for an injury. The breach of duty must be the
proximate cause of the damage to plaintiff. The connection of
cause and effect must appear.

PRINCIPLE APPLIED: A train, going northwest at from 7
to 12 miles per hour, and making much noise, approached the
crossing on a highway running north and south, on which high-
way deceased had been traveling northward for a distance of
some 1,500 feet with a horse and buggy, and at a rate of about
8 miles per hour. Some objects on the east side of the highway
would at times hide the view of the train, but the train was
easily observable for practically the entire 1,500 feet. About
200 feet south of the crossing, deceased stopped. Momentarily
thereafter, the horse took fright, lunged toward the crossing,
there met the engine, veered away, threw deceased out and she
was killed. Assuming failure to give the statutory whistle and
bell signals, *held* that the presumption that deceased exercised
due care carried with it the presumption that she saw the train

in ample time and therefore the failure to give the signals was not the proximate cause of the death of deceased.

*Appeal from Palo Alto District Court.*—HON. N. J. LEE, Judge.

FRIDAY, APRIL 9, 1915.

REHEARING DENIED TUESDAY, OCTOBER 5, 1915.

ACTION for damages for alleged negligence resulting in the death of Teresa Carrigan. The action is brought by the mother of the decedent as administratrix. There was a verdict for the plaintiff. The defendant appeals.—*Reversed.*

*Davidson & Burt* and *E. A. Morling,* for appellee.

*Price & Joyce,* for appellant.

EVANS, J.—The accident involved herein occurred on the highway crossing shortly before 5:00 P. M. on November 29, 1912. The decedent was a young lady 19 years of age, engaged in school teaching five miles distant from her home. She was driving a horse and buggy towards her home at the time of the accident. One of the immediate circumstances of the accident was that her horse became frightened shortly before she reached the crossing, and ran away. It left the highway and jumped over the cattle guards on the railroad right of way, throwing the plaintiff out of the buggy. The train was brought to a quick stop. The body of the decedent was found lying across the rail between the two drivers. Her leg and arm and back were broken. The external evidence of mutilation was comparatively slight, there being no apparent indication that any of the wheels of the engine had passed over any part of her body.

The crossing in question lies 1,500 feet north of the town of Ayrshire. The decedent was traveling north, her home being situated one-half mile north of the crossing. The train was a freight train, consisting of 26 cars and a caboose, and traveling northwesterly. The course of the railway from Ayr-

shire north to the crossing in question is the hypotenuse of a right-angled triangle, the highway upon which the decedent was traveling being the perpendicular, and Allowa avenue, lying along the north line of Ayrshire, being the base thereof. At the avenue, the distance between the highway and the railway would be about 600 feet. Toward the upper end of the triangle there is a slight curve, so that the railway crosses the highway diagonally, a little west of northwest. The principal specification of negligence in the petition was the failure of the trainmen to give warning of the approach of the train. Between the town and the crossing there was a slight up grade. The train was a long one. It proceeded at an average speed of from 7 to 12 miles per hour and was going from 12 to 15 miles per hour as it approached the crossing. The distance from the depot to the crossing along the railway was 2,190 feet. The distance from the point where the engine started would be somewhat less. The whistling post was 950 feet south of the crossing. Witnesses for the plaintiff who saw and heard the train and heard the starting whistles testified that they heard no whistling thereafter at the whistling post nor any ringing of the bell. For the defendant, there was testimony to the contrary as to both warnings, so that a conflict is presented at this point. On the east side of the highway there were a number of residences and appurtenant buildings which, to that extent, would obstruct the view of the train. There was also a slight cut on the right of way near the upper end of the triangle. The train, however, was readily observable at frequent intervals for the entire course of the 1,500 feet. The road approached the crossing from the south, going down grade. From three to four hundred feet south of the crossing were buildings upon the east side of the highway and a slight rise of ground. These obstructed the view of the railway from the highway for a space of 100 feet or more. The decedent was observed by one of plaintiff's witnesses when she drove past these buildings. This witness, French, was one of the occupants of the place. At the same time, he saw and heard the train somewhat south of east of him. The train was

about 100 feet distant from the witness and somewhat further from the decedent. The witness was at that time on slightly higher ground than the decedent. The decedent was next seen by the trainmen, having brought her horse to a "standstill" about 200 feet south of the crossing. The horse was then observed to take fright, and within a few seconds thereafter, the sickening tragedy was done.

The controlling questions presented for our consideration may be stated briefly as follows:

(1) Was there any evidence of any other original negligence than the failure to give statutory signals?

(2) Was there any evidence of negligence on the "last clear chance" theory; that is to say, negligent failure to save the decedent after discovering her peril?

(3) Would the evidence warrant a finding that the failure to warn, if any, sustained any causal relation to the accident?

I. Instruction 15 will indicate concisely the specifications of negligence and the theory upon which the case was submitted in that regard, and was as follows:

"The next question you are required to consider is whether the defendant was guilty of negligence, and you are told that you are not permitted to consider any grounds of negligence other than those of which plaintiff complains. Plaintiff alleges that defendant was guilty of negligence in the following particulars:

"1. In running its said freight train at an unusual time along its track from its depot at Ayrshire, Iowa, toward the highway crossing in question, without giving such signals and alarms as would warn travelers upon said highway, especially those traveling with horses, to prevent them from approaching within an unsafe proximity to said track.

"2. In failing to sound the whistle of said engine sixty rods before reaching said highway and in failing to continuously ring the bell on the engine of said train in approaching said highway.

"3. In failing to keep a lookout on said train for travelers in the proximity of said crossing, especially those having horses that might take fright, in light of the situation and conditions surrounding said crossing and under which defendant's trains were operated.

"4. In failing to slow down or stop said train and to avoid the injury to said Teresa Carrigan after having had time and opportunity so to do after discovering her perilous situation.

"If you find that the plaintiff has failed to show by a preponderance of evidence that defendant was guilty of negligence in some of the particulars of which she complains, she cannot recover in this action and your verdict should be for the defendant."

As already indicated, the time of this accident was shortly before 5:00 P. M. There is no evidence in the record that there was anything unusual about this time. It was not its scheduled time, but it was usually behind its scheduled time. We know of no rule that would permit such fact to be an element of affirmative negligence as against the defendant, though it might be a proper circumstance to be considered for the plaintiff on the question of contributory negligence.

1. RAILROADS: personal injury: negligence: belated train.

It will be noted, also, that some emphasis is laid upon the duty of the trainmen to keep a lookout for travelers in the proximity of the crossing, "especially those having horses that might take fright." The duty of lookout is undoubted, but the suggestion that some special duty rests upon the trainmen to discover the horses which "might take fright" was to open the door of mere speculation and went quite beyond the rule of duty. When horses are frightened in the proximity of the crossing, duty is cast upon the trainmen with reference to such fact. If they approach the crossing

2. RAILROADS: personal injury: negligence: lookout: rule of duty.

with the observance of due care, the fact that some horse *might* become frightened will not convert such care into negligence. But when fright is apparent and danger threatens, they must then use due care to avoid the threatened danger. The only evidence in this case bearing upon that feature of negligence is such as bears upon the question of "last clear chance," and will be considered in another paragraph. There is no evidence or claim in this case that the fright of the decedent's horse was caused by any wrongful conduct in the operation of the train, except the failure to give timely warning whereby the decedent would have been induced to stop at a longer and safer distance from the crossing. It may be noted, also, that the evidence for the plaintiff shows that the horse in question was docile and the decedent had no reason to apprehend undue fear on its part. There was, therefore, nothing out of the ordinary in this feature of the case and nothing upon which original negligence could be predicated.

3. RAILROADS: personal injury: negligence: dragnet instruction.
One other door of speculation was opened in the instructions as indicated in instruction 20, which contained the following:

". . . And if you find that the circumstances and conditions surrounding said crossing and its approach by travelers required the defendant, in the exercise of ordinary care, to give warnings and do *things and acts* in addition to the sounding of the whistle and the ringing of the bell in the manner stated to warn travelers upon said highway to prevent them from approaching within an unsafe proximity to said track when running its trains toward said crossing, and you find that defendant failed to give such additional warnings or do such other *acts and things* as you find were required of it in the exercise of ordinary care in the operation of said train toward said highway crossing, then defendant was guilty of negligence in that respect."

What other "things and acts" should the trainmen have done in order to perform their duty of due care in their approach to such crossing? The pleadings specify none; the evidence discloses none. Appellee relies at this point on *Kinyon v. Railway Co.*, 118 Iowa 349. That was a case where the plaintiff was overtaken with a herd of cattle upon a crossing by a swift train. He pleaded that the view of the track was obstructed by standing cars, by high embankments and tall weeds, and that the speed of the train was so great that a signal at the whistling post left too short a time for him to get off the crossing with the cattle, and that, in view of the great speed of the train and the obstruction of the view of the track, an earlier signal should have been given. It was held that these facts, if proven, would constitute negligence, and that the duty thereby cast upon the railway company was not inconsistent with the provisions of the statute which required the signal to be given "at least 60 rods" distant. There is nothing in the *Kinyon Case* which would permit a jury to consider as negligence "things and acts" not pleaded as such in the petition and not submitted as such in the instructions. We find no evidence in the record of any fact which could be specified as a basis for this part of the instructions. There is no escape from the conclusion that the record discloses no evidence of any original neglect on the part of the trainmen except the original failure to give the statutory signals.

II. Does the record disclose any evidence of neglect on the part of the trainmen in their approach to the crossing after the fright of the horse was apparent whereby danger of collision was threatened? The ·engineer McGowan occupied the right-hand side of the cab. The head brakeman Brown occupied the left side, and, as he claims, was keeping a lookout and ringing the bell. The following is his testimony as to what transpired:

4. NEGLIGENCE: "last clear chance": evidence reviewed.

". . . I was looking north toward the head end of the engine through the front window. The side windows were open, as was the front window. I continued ringing the bell until the time I saw the girl. I continued in that position of looking ahead until I happened to glance to my side *and see the girl standing there.* I know the location of the silo, the barn, the house and the sheds in the triangle there. There are not many trees. When you get north of the barn the ground gradually slopes down. I couldn't tell exactly how much of the highway I could see while traveling along that cut. The closer we came to the crossing the more of the highway I could see. As we approached that crossing, the train was traveling between twelve and fifteen miles. When we left the town I got a highball from the hind end, and giving the sign we started to proceed. We whistled for the crossing, and I started to ring the bell, and I happened to glance over on my left and I see the girl standing there— *a horse and buggy standing there with a girl in it, and almost immediately after I see her there, the horse started to get frisky and I says 'easy on her Mac,' and at once the horse made a lunge.* I says 'that will do' and he throwed her into emergency. I stopped ringing the bell just as soon as I saw the horse standing there starting to get frisky. Just as soon as I said 'easy,' McGowan shut off the steam, which stops the exhaust noise of the engine. Mac threw it into emergency when I said 'easy on her.' The horse was coming down the road towards the train. He continued down the road until we were on the crossing. He couldn't have got across ahead of us on the crossing. He took the fence— went down the fence to the post—and struck the cattle guard, and turned directly north on the track. At the time the horse left the traveled portion of the road, he was on a gallop. The girl was holding the lines stiff. It looked to me like he had the bit in his teeth. When the buggy struck the wing gate of the cattle guard it tipped her right out in the middle of the track. The horse broke loose and was gone up the

track. It looked to me like the left-hand side of the buggy pushed the wing of this cattle guard down, and it ran up on it and tipped her out. The last I seen her, she was just going out of the buggy. She had not hit the ground when I saw her. The air pump in front of the fireman's seat box on the side of the boiler obstructed my vision. When I last saw her she was in front of the pilot of the engine. From the time I said 'that will do' from the time I have just described, the speed of the train was changed. It was almost still. The pilot just surged onto the buggy, and it kind of crushed it, and it all came onto the left side. When the buggy was turning over, it turned very rapidly. The buggy struck the cattle guard and dumped over before the engine hit it. After the engine stopped I followed the fireman out on the gangway and got down on the ground, and went around to the front end looking for her. When I got around I seen the engineer just going up on the gangway, and the girl lying across the track between the middle drivers. McGowan slacked the train back about three inches. I pulled her out. She was lying with the rail right across her, her hands out and her feet on the inside. She had on a pair of gloves and a pair of mittens over them. She had on an overcoat and a red stocking cap. She had lost the cap before she got to the track. . . ."

CROSS-EXAMINATION.

"I placed the locomotive where it appears in that picture. We pulled up there and stopped, and I went over in the road where I know she stood. Mr. Beardslee had the buggy, and I came up on the engine and stopped the engine, and told them right where the buggy was the time I first seen her. I located the point where the engine was from the barn. In locating the engine when you made the photograph, it was about eighty feet south of the south cattle guard. We were going from 12 to 15 miles an hour when the engine stood as I have located it in this picture. I took

the engineer's word for the speed. It would be my judgment that it was 12 or 15 miles an hour. The next I noticed the horse began to rear, and after it reared it plunged and came down the road about half way from the point where it was standing to the track. When the horse commenced to rear I said 'easy' and he stopped the exhaust. I gave the other signal immediately after that. I saw the girl holding the horse when it was rearing. She held it a moment or so; then it got away. I don't know how far the horse had gone when I told him 'that will do.' . . . I looked at the barn with the idea of fixing its location. When I could see her across the corner of the barn, that is when I first saw her, there was nothing north of the barn between the track to interfere with my vision. My recollection is that she was a little better than clear of the barn when I saw her. At the time of the accident when I went up the road to the point where I first saw the girl, we must have backed eight or ten car lengths. What I did that day was simply to locate the buggy where I first saw it. The barn was all I had to locate it from. The other day when the photographs were taken, I located the buggy in the same way. After getting her location, I figured back as to where I was on the engine when I saw her. When I first saw her she was a little more than clear of the barn. Where the buggy track left the road I would say was about 100 feet from where I first seen her. I do not remember the individual whistling posts at which the engineer whistled on the day of the accident. I know exactly the locations of the girl and the engine when I first saw her. I have been up and down there most every day since it happened, and I have pictured in my mind where that buggy stood. Every time going north I have looked to see where I was located, and to see where the girl was located. When I said 'easy,' the horse was rearing, and immediately after it started I said 'that will do.' I can't locate how far the horse had gone when I said 'that will do.' It hadn't left the traveled track. I don't know where we were at that time,

but we were so close on the crossing the horse could not have gotten across. He had to go to the fence in order to get in ahead of us. Just as soon as I saw the horse rear, I said, 'easy,' and she was then about two hundred feet back. I made a mental note at the time I gave the signal. I thought it all over after the accident. The train crew and myself have talked it over a little. I didn't ask any questions. I just told it. They asked me a few questions.''

Engineer McGowan testified as follows:

''. . . As we were proceeding up past the whistling post towards the crossing, the exhaust from the engine was quite loud. After I blew this whistle, we proceeded along about 50 rods or 60 before anything happened. I was just a short distance south of the cattle guard. I was looking straight ahead. I heard Brakeman Brown say 'easy.' Upon hearing this I shut off the throttle. I shut off the throttle, and immediately he said 'that will do,' and I threw the brake valve into emergency. The puffing ceases by shutting off the throttle, and stops the power of the engine. At this place south of the crossing when I shut off the engine I should judge I was traveling between ten and twelve miles an hour. 'That will do' means to stop. He said 'that will do' just as loud as he could. It conveyed to me that there was danger and I must stop. When you let loose of the throttle, your hand will drop on top of the brake handle. We had a Westinghouse brake on that train. It is a standard equipment. The brake lever can move from two or three inches in its quadrant. When he stated that will do, I put it into emergency. You shove it away in a Westinghouse. I shoved it over the full length of the quadrant. I then stood up and leaned out of my right cab window, so I could look around the pilot. I was looking ahead. When I got up and looked out I saw a horse jumping over the cattle guard and immediately the buggy coming up and turning over on the cattle guard. I saw someone in it, but I didn't recog-

nize whether it was a man or woman or a girl. The horse was going north over the cattle guard. It was not hitched to the buggy at the time I saw it. The pilot of the engine when I saw all of this was just about going up on top of the buggy. The person was falling right in the center of the track ahead of the engine. When I saw this I didn't do anything. I couldn't do anything. There was no other appliances or machinery or lever or throttle or anything else connected with the operation of stopping of the engine that could have been operated at that time. There had been a slackening in the speed from the time I had thrown the emergency throttle over until I looked out. The engine just seemed to stop, and it just seemed like the slack ran up and forced it. The engine seemed to stop and then surge up. The slack from the rear end causes this surge. It is on account of the brakes setting on the engine and head cars quicker than the rear cars. The slack from the rear end coming up against the ones that have already stopped bunts them ahead. When I looked down I saw the girl lying, screaming. I immediately jumped down off the seat, and climbed down and got hold of her. When I climbed out of the engine I stepped on the cattle guard, the board that runs up and down to the cattle guard and the fence post. She was lying with her face down, the main driver having her clothes caught. She was lying on her stomach. Her body was resting over the right rail going north. I tried to remove her but could not. I immediately went back to the cab and released the air and slacked the engine back just slightly and put the air on again. Brown and Thompson came around and I hollered to Brown to pull her out. The distance between the two drivers wouldn't be much over two feet on the rail. It was within that space that her body was lying. There would be one driver and a pony truck wheel ahead of her body. There was no evidence at any place where either of those wheels had passed over her body. . . ."

CROSS-EXAMINATION.

"I believe a train under the conditions stated could be
stopped between 60, 80 or 90 feet. I don't know whether
there is any later improvement on this Westinghouse brake
or not. It is not over three or four years old. It is about
as good as the average brake valve. Before I received the
signal 'easy' nothing had occurred out of the ordinary that
day. We had gone from Fort Dodge to Ayrshire pretty
nearly fifty miles. I always whistle at all of the whistling
posts, and I don't believe that I have ever passed a road
crossing without whistling for it, not unless it was at night
when I could not see it. I have been running freight trains
for seven years pretty near all of that time. I don't know
as I would want to say that the bell was rung for every
crossing in my seven years' experience. I remember par-
ticularly giving the 'highball' at that time. I don't charge
my memory with every time I blow the whistle, or with every
time I hear the bell rung. There was a whistling post there
and we always whistled for that post going out of Ayrshire.
The reason I say I whistled on that day was because I remem-
bered whistling on that day, and especially after the acci-
dent I do. I believe I called Thompson's attention to it
if he didn't remember of my blowing whistle and he said
he did. I don't remember whether they asked me the ques-
tion. There was some talk about it. It was almost instantly
from the time he said 'easy' that he said 'that will do.'
There was practically no space between. He didn't tell
me what the trouble was on either occasion. When he said
'easy' I said I shut off the steam or throttle. Then he said
'that will do,' and I put the brake in emergency as quick
as I could. It was practically one motion, shutting off the
steam and throwing in the emergency. The number of feet
that the train would come to a dead stop after he said 'easy'
would be somewhere around 60 to 80 feet. . . . It is my
judgment we were going from 10 to 12 miles an hour. My

attention was not called particularly to the speed. I judge from my recollection of it at the time. I said that I stopped it just as soon as it could be stopped, somewhere along between 60, 80 and 90 feet. When the brakeman first spoke I put my hand on the throttle and shut it off. When he spoke again, I dropped my hand to the brake and shut that off. I was turning my head towards him. I was not looking out of the window. I looked out of the window afterwards. I was standing up, looking out of the right cab window when I saw the buggy going over."

Similar testimony was given by the fireman, except that his duties gave him less opportunity for observation. The testimony above quoted from the abstract is set forth by question and answer in an amended abstract, which does not impeach the foregoing in any material respect. No testimony was offered on behalf of plaintiff tending to show negligence at this point. The plaintiff does assail the consistency of the testimony of the engineer and brakeman. It was the claim of brakeman Brown that when the horse began to rear, the engine was about 80 feet south of the crossing; that he gave the signals "easy" and "that will do" in quick succession. The latter means a quick stop. The engineer claims that he brought the train to a stop in from 60 to 90 feet. He claims that his engine was at the west cattle guard when he stopped. Witnesses for the plaintiff testified that the engine was 50 feet beyond the cattle guard when it stopped. All the expert witnesses testified that it would take from 100 to 150 feet to bring such a train to a stop after throwing on the emergency brake when going at a speed of 12 miles per hour. Counsel presents certain computations, the net effect of which is to show that the estimates of distance could not have been literally correct because inconsistent with each other. It is shown, for instance, that upon certain experiments made by plaintiff's witnesses, a person standing on the highway 200 feet south of the crossing could see the "top 3

feet'' of a 10-foot pole at a point on the railroad track 272 feet south of the crossing. The argument is that the brakeman, therefore, must have seen the decedent when the engine was 272 feet distant. The situation was such that, as the observer would recede along the highway further from the crossing than 200 feet, the view of the railroad track would be accordingly shortened. The testimony as to distance was an estimate only. The true distance might have been somewhat greater or somewhat less without impeaching the candor of the witness or the substantial value of his testimony. If his testimony is to be believed, the horse was standing still when he first saw it and he saw the beginning of the fright. If, therefore, he had seen it earlier at such a distance from the track, there was nothing in such a situation to call for a change of conduct.

The discovery of the fright of the horse and the danger imminent therefrom undoubtedly cast upon the trainmen the duty to avoid the threatened injury to the plaintiff so far as it lay within their power. Due care in such a case would be such a high degree of care as to be commensurate with the threatened injury. It is shown without dispute that the train was brought to a very quick stop. Several passengers on the train were witnesses. Some of them had been thrown from their seats to the floor of the car. The commotion of the sudden stop attracted the attention of many people within a considerable distance and they hastened to the spot to learn the cause of it. The horse galloped down the highway. At 80 or 85 feet from the crossing, it veered to the left and ''headed'' for the right of way, jumped the cattle guards, and escaped up the right of way ahead of the train, having broken loose from the buggy when it overturned in front of the train. In considering this testimony, it must be borne in mind that the entire accident, from its beginning to its awful end, was a matter of a very few seconds.

On the question of negligence at this point, it is not very material whether we deem it as pertaining to the ''last

clear chance'' doctrine or whether we deem it as independent
and original negligence. If the trainmen failed at this point
to exercise the degree of care incumbent upon them to avoid
the threatened injury to the plaintiff, the defendant would
be liable on either theory, because such negligence would be-
come the proximate cause of the injury. The duty of the
trainmen would be predicated, of course, in large measure
upon the helplessness on the part of the decedent to save
herself. Theoretically, she would be required to exercise care
also. But under the circumstances shown here, her helpless-
ness was complete after she lost control of the horse; so that
contributory negligence was quite impossible.

As already indicated, the plaintiff offered no evidence
on her own part of the negligence of the trainmen at this
point; she relies wholly upon the testimony for the defense
and what is claimed to be its improbabilities or its incon-
sistencies.

It seems clear to us that the testimony does not show any
negligence of the trainmen at this point, but, on the con-
trary, negatives it completely.

III. Assuming that the evidence is sufficient to go to
the jury on the question of whether the
statutory signals were given, the question still
remains whether such failure sustained any
causal relation to the accident.

5. NEGLIGENCE:
statutory
duty : viola-
tion : proxi-
mate cause.

We have already indicated the proximity of the railway
to the highway and the opportunity for seeing the train.
Several witnesses testified for the plaintiff to the fact that
they had not heard the statutory signals. In each instance,
however, their attention had been attracted to the train by
its loud noises and the unusual quantities of smoke and steam
which it was emitting. This resulted from the fact that the
train was a very heavy one, and was pulling up more or less
of a grade. The witnesses on both sides testified to its speed
at an average of from 7 to 12 miles per hour. Plaintiff's wit-
ness, French, was the last to see the decedent before she was

seen by the brakeman.  He was at the house nearest to the
crossing on the east side of the highway.  This was about
300 or 400 feet from the crossing.  He saw the decedent pass-
ing along the highway 50 feet to the west of him and saw
the train upon the track 100 feet to the east of him, or a
little south of east.  He estimated the speed of the train at
7 or 8 miles per hour.  About 200 feet or a little more further
south on the west side of the street was the Anglum home.
The mother of the decedent, plaintiff herein, was at this home
when her daughter drove by.  According to the mother, as a
witness, the daughter was driving at that time at about 8
miles an hour.  Her custom was to drive the 5 miles in 40
minutes.  That was the gait of the horse.  After passing the
Anglum home and after passing French, there would be a
short distance where the buildings occupied by French would
cut off the view of the train from the decedent.  The con-
tention of the defendant at this point is that the decedent
drove within sight of the train practically all the way from
Ayrshire; that the train was in plain view and hearing all
the time; that, inasmuch as she was approaching the cross-
ing, ordinary care required her to observe the approach of
the train in the same direction; and that a presumption of
fact arises that she did exercise ordinary care and did, there-
fore see, the train and knew of its approach to the crossing.
Concededly, when the decedent passed the Anglum home she
could have seen the train from that point.  Her mother tes-
tified as follows:

"I don't doubt it at all, if she looked, or thought, or
realized that the train was on the track, that she could have
seen it and she never would have taken the chance to drive
so close."

When she passed French, she appears to have slackened
the pace of her horse and was between a "trot and a walk."
It is urged for the appellee that there were many obstruc-
tions on the east side of the highway and that there were only

a few narrow places where a view could be had. The record contains a large number of photographs taken from points 150 or 200 feet apart along the highway when looking toward the east. These photographs leave little room for argument on the proposition that the train was easily observable from the highway. It is true that photographs have their own deceptions, especially as to distance and proportion and perspective. But they cannot avoid obstructions to a line of vision. The decedent was presumed in the first instance to have exercised ordinary care on her part in approaching the crossing, and the trial court so instructed. The verdict sustained such presumption. The fact that she had brought her horse to a stop at 200 feet from the crossing supported such presumption strongly. The question that arises, then, is: Could she have exercised ordinary care in her approach to the crossing and yet failed to observe the train that was approaching the same crossing, and that was in plain view and hearing? Or must it be said, upon the undisputed facts relating to her conduct, that she did see the train and did govern her conduct thereby? We see no way to harmonize a finding of due care on her part without also finding that she looked for a train and necessarily observed it. This is consistent with the stop which she made 200 feet away. It is urged that she would have stopped at a safer distance if she had had warning. There is nothing in the evidence to justify this assumption. The horse was supposed to be gentle. It was not afraid of automobiles. It had never made trouble before. If the decedent knew of the approach of the train by observing the same as she drove along the highway, then the failure to signal at the whistling post was not material to her. In such case, the failure to give the statutory signals could not sustain any causal relation to the accident. The "runaway" occurred notwithstanding her knowledge of the approach of the train. The recent case of *Hunt v. Delano,* 169 Iowa 138, is relied on at this point. The only question under consideration by us in that case was whether the de-

cedent was guilty of contributory negligence as a matter of law. The question of the actionable negligence of the defendant was not disputed before us in that case. We held therein that the decedent was not, as a matter of law, guilty of contributory negligence. If such were the question herein, we should have no trouble in reaching the same conclusion. We reach the conclusion that the presumption of due care which obtained in favor of the decedent carried with it the presumption that she saw what ordinary care would necessarily see. If she saw the train at a safe distance, the accident could not be deemed to have been caused by the failure of the statutory warning signals. Indeed the "runaway" stands forth as the real cause of the injury—too plainly for candid dispute. The evidence will not warrant affirmative finding that such "runaway" was caused by any negligent act of the trainmen or was induced by any contributory negligence of the decedent.

The judgment entered below must therefore be—*Reversed.*

DEEMER, C. J., PRESTON and SALINGER, JJ., concur.